1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                         SOUTHERN DISTRICT OF CALIFORNIA

10

11   JEFFERSON SISON,                  )  Civil No. 09-1185-BEN(WVG)
                                       )
12                  Petitioner,        )  REPORT AND RECOMMENDATION
                                       )  DENYING PETITION FOR WRIT
13   v.                                )  OF HABEAS CORPUS
                                       )
14   LARRY SMALL, Warden,              )
                                       )
15                  Respondent.        )
     _____

16

17        On May 29, 2009, Petitioner Jefferson Sison (hereafter

18   "Petitioner") filed a Petition for Writ of Habeas Corpus (hereafter

19   "Petition").  Respondent Larry Small (hereafter "Respondent") filed

20   an Answer to the Petition.  Petitioner filed a Traverse to Respon-

21   dent's Answer.  The Court, having reviewed the Petition, the Answer,

22   the Traverse and the documents lodged therewith, find that Peti-

23   tioner is not entitled to the relief requested and RECOMMENDS that

24   the Petition for Writ of Habeas Corpus be DENIED.

25   A. PROCEDURAL HISTORY

26        On July 15, 2005 in the San Diego Superior Court, Petitioner

27

28

1   was convicted of one count of carjacking [Cal. Penal Code §215(a)][1/],

2   one count of attempted carjacking [§§215(a), 664] and one count of

3   first degree murder [§187(a)].  The jury also found that Petitioner

4   personally used a firearm during the commission of the carjacking

5   [§12022.5(a), 12022.53(c)], that he personally used and personally

6   discharged a firearm during the commission of the attempted

7   carjacking [§12022.5(a), 12022.53(c)], that a principal was armed

8   with a firearm during the commission of the murder [§12022(a)(1)]

9   and the murder was in the commission or attempted commission of a

10  robbery. [§190.2(a)(17)] (Respondent's Lodgment No. 1 at 141-145).

11       On October 6, 2005, the court sentenced Petitioner to a

12  determinate term of 28 years and six months imprisonment, and a term

13  of life imprisonment without the possibility of parole. (Respon-

14  dent's Lodgment No. 1 at 474-475, Respondent's Lodgment No. 2 at

15  1725, 1728).

16       Petitioner appealed the judgment.  On November 13, 2007, the

17  California Court of Appeal reversed the carjacking conviction and

18  otherwise affirmed the judgment. (Respondent's Lodgment No. 3).

19       Petitioner filed a Petition for Review of the Court of

20  Appeal's decision in the California Supreme Court.  On February 27,

21  2008, the California Supreme Court denied the Petition for Review

22  without comment or citation to authority. (Respondent's Lodgment No.

23  5).

24       On May 29, 2009, Petitioner filed the Petition that is now

25  before the Court.  On September 16, 2009, Respondent filed an Answer

26  to the Petition.  On November 12, 2009, Petitioner filed a Traverse

27

28
_____

[1/]   All references to code sections are to the California Penal Code,
unless otherwise noted.

1    to Respondent's Answer.

2    B. STATEMENT OF FACTS

3         This Statement of Facts is taken substantially from the

4    California Court of Appeal unpublished opinion, *People v. Martin*, et

5    al., No. D047341 (Cal. Ct. App., 4th Dist. Div. 1, Nov. 13,

6    2007)(Respondent's Lodgment No. 3).   This Court relies on these

7    facts under 28 U.S.C. § 2254(e)(1). See <u>Park v. Raley</u>, 506 U.S. 20,

8    35-36 (1992). (holding findings of historical fact, including

9    inferences properly drawn from such facts, are entitled to statutory

10   presumption of correctness).

11        1. Arnquist Carjacking

12        On December 28, 2003, at 10:45 PM, Steven Arnquist (hereafter

13   "Arnquist") was driving a black Honda Civic, equipped with a premium

14   stereo system, 17-inch chrome wheel rims and low profile tires, when

15   he stopped at an automatic teller machine in a parking lot of a

16   shopping center in Spring Valley, California.   Arnquist's fiancee,

17   Taneisha Taylor (hereafter "Taylor") was a passenger in the vehicle.

18   When Arnquist realized that he had not signed the check he planned

19   to deposit in the automatic teller machine, he returned to his car

20   and sat in the driver's seat to sign the check.   The driver's side

21   door was open.   Taylor stood outside the car next to him.

22        Suddenly, two men ran up to Arnquist and Taylor. Taylor began

23   to scream.   One man held a gun to Arnquist's face and told him to

24   hand over his wallet.   Arnquist complied.   The man ordered Arnquist

25   to get up, but when Arnquist began to stand up, the man hit him with

26   the gun and pushed him.   The other man opened the passenger side

27   door and ordered Arnquist to pop open the trunk with the trunk

28   release lever, give the car keys to the first man and get out of the

car. Arnquist complied. The second man then grabbed Taylor's hair, held a gun to her head, pulled her to the back of the car and ordered her to get in the trunk.

Virgilio Villegas (hereafter "Villegas"), who had just left a grocery store in the shopping center, noticed a commotion in the parking lot and drove toward it. When he saw a woman on the ground, he started honking his horn at, and flashing his headlights on, the people near Arnquist's vehicle. When the man holding Taylor heard Villegas' car's horn, he released her and said "Let's get out of here," and entered Arnquist's vehicle and drove away. Villegas called 911 and drove Arnquist and Taylor to a Sheriff's substation nearby.

Arnquist described the first man who approached him as more husky than the second man who approached him. Arnquist further described the men as Asian, approximately five feet, eight inches to five feet, ten inches tall, and weighing between 200 and 225 pounds. Taylor thought the men were Filipino or Mexican. Both men wore hooded sweatshirts and masks. One of the men wore camouflage-type pants.

The following day, Petitioner's co-defendant Robbie Martin (hereafter "Martin"), who worked as a security guard at the Sycuan casino, told two of his co-workers, Curtis Kellas (hereafter "Kellas") and Joseph DeBenedetti (hereafter "DeBenedetti"), about a recent Spring Valley carjacking in which he and his partner held two people at gunpoint and took their vehicle. According to DeBenedetti, Martin described how he enjoyed the carjacking "from start to finish." Martin drew a street map of the shopping center. Petitioner, who was present during the conversation with

1   DeBenedetti, glanced at the map and nodded his head.   Martin said

2   "Oh, hey, I was talking about what we did the other night...You know

3   what I mean? Petitioner responded "Oh, yep, yep."   According to

4   DeBenedetti, Petitioner did not seem surprised and displayed a "ha

5   ha ha, hee, hee, yep, that kind of attitude."

6        On December 30, 2003, Sheriff's Deputies recovered Arnquist's

7   vehicle from a residential area in Spring Valley.   The vehicle no

8   longer had the premium stereo system, wheels or rims.   The axle was

9   bent and the car could not be driven properly.

10       In May 2004, Arnquist and Taylor were shown photographic

11  line-ups. At first, Arnquist did not recognize any of the persons

12  depicted in the photographs he was shown.   However, after Arnquist

13  looked at the photographs a second time, he pointed to the picture

14  of Martin.   Arnquist said that the photograph of Martin looked

15  familiar and could have been one of the men involved in the

16  carjacking.  Taylor was unable to identify Petitioner or Martin from

17  the photographs that she was shown.   At trial, Arnquist could not

18  identify either Petitioner or Martin.

19       2. King Attempted Carjacking and Attempted Murder

20       On March 4, 2004, Martin arranged a meeting with Benjamin

21  King (hereafter "King"), from whom he was purchasing anabolic

22  steroids.   At about 9:15 PM that evening, King was sitting in his

23  vehicle with his motor running at the appointed location for the

24  meeting, when he saw two people approaching from the rear.   One man,

25  whom King later identified as Martin, walked up to the passenger

26  side of the vehicle and knocked on the window.   King motioned for

27  the man to get into the vehicle.   The man stepped back, pulled a

28  bandana over his face, opened the passenger side door, stuck a gun

1   in King's face, and ordered to King to get out of the vehicle.  At
2   the same time, the other man, who King later identified as Peti-
3   tioner, opened the driver's side door and hit King with a gun.  King
4   released the emergency brake and floored the gas pedal.  When the
5   vehicle began to move, Martin, who was partially in the vehicle,
6   fired a shot at King.  The bullet hit the post behind King's head,
7   but shrapnel struck King in the shoulder.  Petitioner fired a shot
8   at King, but missed.  King quickly drove away.

9        King had never met Martin before.  All of their discussions
10  leading to Martin's purchasing of steroids had been on the tele-
11  phone.  Martin was referred to King by DeBenedetti.  After the
12  attempted carjacking, King left DeBenedetti a voice mail message. In
13  the voice mail message, King told DeBenedetti not to tell Martin
14  anything about him.  That night, King did not contact law enforce-
15  ment authorities because he believed that the authorities would not
16  do anything and because he did not want to get in trouble for
17  selling steroids.  The following day, King changed his mind and
18  contacted the authorities.

19       In late March 2004, Sheriff Detective Douglas Akers (hereaf-
20  ter "Akers") received information from Sycuan casino about a
21  carjacking that occurred on December 28, 2003.  Sycuan put Akers in
22  touch with Kellas and DeBenedetti.  Kellas gave Akers a pocket-sized
23  digital recorder with a recording of portions of the conversation
24  between him, DeBenedetti and Martin.  During Akers' interviews with
25  Kellas and DeBenedetti, Akers learned about the attempted carjacking
26  of King.

27       On March 24, 2004, Akers interviewed King, examined the
28  vehicle King had been driving on March 4, 2004 and showed King two

photographic line-ups.  King identified Petitioner in one of the photographic line-ups that he was shown.  In the other photographic line-up, King initially said that the photograph of Martin looked like the other man who attempted to carjack his car, but was thinner.  Ultimately, King selected the photograph of another man in the line-up as the second assailant.  At the preliminary hearing and at trial, King identified Petitioner and Martin as the assailants.

On April 20, 2004, Sheriff's Deputies arrested Petitioner and Martin.  Akers told Martin that he was a suspect in the Arnquist carjacking.  At first, Martin denied participation in the carjacking.  Martin also denied knowing King.  After Akers showed Martin cellular phone records indicating that he and King had numerous telephone calls with each other, Martin said that he was trying to buy steroids from King.  After Akers played the recording of the conversation Martin had with Kellas and DeBenedetti, Martin admitted that he had carjacked Arnquist's vehicle.

Akers also questioned Petitioner.  Petitioner denied knowing King.  After Akers confronted Petitioner with a piece of paper found in Petitioner's car that had King's name and cellular phone number on it, Petitioner admitted that he knew King.  When Akers played the recording of Martin telling Kellas and DeBenedetti about the Arnquist carjacking, Petitioner denied participation in the crime. Petitioner said that in the recording, Martin was not referring to him.

### 3. Luna Murder

On April 8, 2004, Francisco Luna (hereafter "Luna") owned and was driving a black Lexus with 20-inch Diablo wheel rims, which was equipped with a flip-up dashboard television, a passenger side visor

1  television, and a driver's side visor television.  On that day, Luna

2  had told his girlfriend and his cousin that he was going to look at

3  a gun he wanted to buy.

4       On April 9, 2004, a bicyclist on International Road in south

5  San Diego saw shell casings, blood and drag marks on the road.  It

6  was later determined from the casings that the gun that was used was

7  .380 caliber.  The bicyclist followed the drag marks to a brush area

8  and discovered a dead body underneath a piece of carpet.  The body

9  appeared to have been dragged to where the bicyclist found it.  San

10 Diego Police later identified the victim as Luna. An autopsy on the

11 body revealed that the cause of death was gunshots to head and body.

12      Jason McDaniel (hereafter "McDaniel") was a friend of Luna

13 and Martin.  McDaniel contacted the police and told them that a few

14 days before Luna was killed, Martin had asked him about Luna.

15 Martin wanted to know if Luna carried a gun and who might back up

16 Luna if he got into trouble or was confronted by gang members.

17 McDaniel said that he had not thought much about Martin's questions

18 at the time, but after Luna was killed, he immediately connected the

19 conversation with Martin to Luna's killing.  McDaniel also said that

20 a few days after Luna's killing, Martin visited him and asked him if

21 he wanted to buy wheel rims.  The wheel rims were the same as those

22 on Luna's Lexus.

23      After McDaniel was interviewed, Detective Jonathan Smith

24 conducted a background check on Martin and discovered that Martin

25 had been employed at Sycuan casino and was in custody for a

26 carjacking and shooting in Spring Valley.

27      On May 7, 2004, another detective interviewed Thomas

28 DiFrancesco (hereafter "DiFrancesco"), a slot machine attendant at

1  the Sycuan casino.   At first, DiFrancesco denied knowing anything
2  about Luna's Lexus and Luna's killing.   The detective persuaded
3  DiFrancesco to tell him what he knew about the Luna killing.
4  DiFrancesco told the detective that he had a conversation with
5  Martin and had taken Martin to where Luna's Lexus was found.
6  DiFrancesco showed the detective where the Lexus was found.

7         DiFrancesco agreed to be interviewed at police headquarters.
8  At police headquarters, he said that there was another person with
9  Martin, who he thought was named "Jeff." Jeff arrived in the black
10  Lexus with shiny wheel rims.   Jeff went to a liquor store to obtain
11  a crate to put under the Lexus after the tires were removed.   He
12  said that Martin became frustrated with Jeff because Jeff did not
13  know how to "jack up" a car, so Martin pushed Jeff out of the way to
14  do it himself.   The wheel rims were removed and placed in the back
15  of Martin's car.

16         On June 9, 2004, another detective interviewed DiFrancesco.
17  At first, DiFrancesco denied going to Martin's residence on the
18  night Luna was killed. However, after the detective persuaded him to
19  tell him what he knew about the Luna killing, DiFrancesco started
20  crying and asked "What if I witnessed something?" Then DiFrancesco
21  admitted that he was there when Luna was killed, but did not know
22  the killing was going to happen. He told the detective that he heard
23  Martin describe the gun as a .380 caliber gun.   Thereafter, he
24  showed detectives where Luna was killed, where his truck and Luna's
25  Lexus had been parked, how he and the others walked into the field,
26  where each person was standing and where the gun fire began.

27         In October 2004, DiFrancesco was informed that he would not
28  be prosecuted for stripping Luna's Lexus or disposing of the stolen

1    property from the Lexus.

2         At trial, DiFrancesco was the prosecution's chief witness. He

3    testified as follows:

4              On April 8, 2004, he called Martin to in-
               quire about stereo equipment that Martin
5              was selling.   During the conversation,
               Martin asked him if he knew anyone who
6              wanted to buy a gun. Throughout the day, he
               and Martin talked several more times.
7              Martin invited him to come to his house at
               11:00 PM.  Martin also instructed him to
8              say, "I forgot it," when he arrived.

9              He drove to Martin's residence, where Mar-
               tin, Petitioner and Luna were standing
10             outside.  Martin asked him "Did you bring
               it?" He had forgotten Martin's instruction
11             and said "Bring what?"

12             Martin introduced him to Luna and they
               discussed Luna purchasing a gun from Mar-
13             tin.  When Luna went to his car to get
               something, Petitioner pulled a gun from his
14             waistband and handed it to Martin, who
               tucked the gun in his waistband.  Peti-
15             tioner said, "Here, you do it."  When Luna
               came back to the group, he wanted to make
16             sure that the gun worked properly, so the
               group decided to go somewhere to test fire
17             the gun. The group left Martin's residence.
               Petitioner rode with DiFrancesco in
18             DiFrancesco's truck and Martin and Luna
               left in Luna's Lexus with Martin driving.

19
               The group drove to a secluded area near the
20             international border, parked and began to
               walk on an unpaved road along a river bed.
21             Martin left the group and walked up an
               embankment.  Petitioner walked into some
22             bushes.  Martin suddenly turned around and
               fired a gun at Luna.  As Luna tried to run,
23             Martin shot him in the back.  Martin chased
               Luna while he continued to shoot at him.
24             Petitioner came out of the bushes and
               started to chase Luna.  After the shooting
25             stopped, it appeared that Martin and Peti-
               tioner were tugging at Luna's leg.  Martin
26             came back to where DiFrancesco was standing
               and Petitioner followed, but was limping.
27             Martin, Petitioner and DiFrancesco returned
               to the vehicles.   Martin drove with
28             DiFrancesco and told Petitioner to drive

Luna's Lexus.  The Lexus was driven to "The Spot," a street in a residential area of Spring Valley where cars are frequently stripped.  They decided not to strip the car at that time.  Martin told DiFrancesco to go home.

On April 9, 2004, between 1:30 and 2:00 AM, Martin called Saroun Morn, a co-worker at the Sycuan casino and asked if Morn had a garage where he could store a Lexus.  Morn thought he heard a voice in the background which he thought was Petitioner's voice.  Morn told Martin that he did not know of any place to store a Lexus.

Later that morning, DiFrancesco met with Martin and Petitioner. They went to an apartment complex in El Cajon, California, where Petitioner parked Luna's Lexus in an alley.  DiFrancesco watched as Martin and Petitioner, both of whom were wearing gloves, stripped down the Lexus.  Martin and Petitioner removed the wheel rims and put them in the back of DiFrancesco's truck.  Other items from the Lexus were put in Martin's vehicle.  The stripped Lexus was left in the alley.

Sometime in April 2004, Martin tried to sell 20-inch Diablo chrome wheel rims to some co-workers in the employee parking lot of the Sycuan casino.  Martin said that the wheel rims were from a Lexus.

The prosecution also presented Martin's cellular phone records, which indicated that he drove from Spring Valley to south San Diego on two separate occasions between the late night hours of April 8, 2004 and the early morning hours of April 9, 2004.  The records showed a large number of calls between Martin and Petitioner and Martin and DiFrancesco during those hours.

### 4. Martin's Defense

Martin admitted that he carjacked Arnquist's vehicle on December 28, 2003.

Martin also admitted that he made plans to buy steroids from King on March 4, 2004. However, he sent Petitioner and DiFrancesco to meet King and make the purchase because his girlfriend was

09CV1185

expecting him that night.  Martin testified that he spent that night with his girlfriend and did not see Petitioner or DiFrancesco until the next day.  The next day, Martin asked Petitioner, who he had given $200 for the steroid purchase, if he had the steroids.  Martin stated that Petitioner told him that he and DiFrancesco had tried to "jack" the car, but they "fucked up."  Martin's girlfriend testified that he spent the evening with her and that she was sure because of an entry she placed in her journal.

Martin denied having anything to do with Luna's killing.  He stated that Luna wanted to buy a gun and that he knew that DiFrancesco had a gun for sale.  Martin arranged to be the "middle man" in the gun sale.  Luna, Petitioner and DiFrancesco were present at the gun sale site.  After Luna said that he wanted to go somewhere to test fire the gun, Martin left to sell some stolen radios that Petitioner had brought to Martin.  Martin said that he was informed by telephone that Luna and DiFrancesco could not find a location to test fire the gun and suggested that DiFrancesco "hook-up" with Petitioner.  Petitioner later called Martin and suggested that Petitioner meet Martin at a field near the international border.  Martin said that he could not find the location, so he went home and called DiFrancesco at 12:44 AM to find out whether DiFrancesco had sold the gun to Luna.  DiFrancesco told Martin that Luna did not buy the gun, but asked for Martin's help in finding a garage to house a car that he had just carjacked.

Martin met DiFrancesco and Petitioner in a Spring Valley shopping center. The three of them exited the parking lot and left Luna's Lexus at "The Spot" (an area in Spring Valley where many stolen cars are brought to be stripped) for the rest of the night.

1       The next day, Martin, Petitioner and DiFrancesco stripped the
2   Lexus in an alley near DiFrancesco's residence.   Martin did not know
3   the Lexus was Luna's car until a few days later, when McDaniel told
4   him that Luna had been killed.

5       5. Petitioner's Defense

6       Petitioner denied participating in the Arnquist carjacking on
7   December 28, 2003.   He testified that on that evening, long-time
8   friends had visited him and brought a gift for his daughter.
9   Petitioner said that Martin lied when he testified he talked to
10  Petitioner about stripping Arnquist's car the day after the
11  carjacking.   Petitioner said that Martin bragged about carjackings
12  all the time.   Petitioner said that if he heard Martin say anything
13  about Petitioner's involvement in the crimes, he would have denied
14  any participation, and would have called Martin a liar.

15      Petitioner denied that he had anything to do with the
16  attempted carjacking of King.   Petitioner said that Martin had given
17  him King's telephone number because he was interested in working out
18  and Martin suggested he use steroids.   Petitioner said that he was
19  with his girlfriend in their apartment on the night of the King
20  attempted carjacking.

21      Petitioner denied anything to do with Luna or Luna's car.   He
22  testified that on the night of Luna's killing, he spent the night
23  with his girlfriend in their apartment watching wrestling on
24  television.   When the wrestling program ended, Petitioner went
25  outside to smoke a cigarette with his neighbor Sandra Washington.
26  Washington testified that she saw Petitioner on his porch smoking a
27  cigarette between 10:00 PM and 10:30 PM on the night of Luna's
28  murder.

C. GROUNDS FOR RELIEF

Petitioner raises four grounds for relief. Each ground is based on an alleged violation of his right to due process guaranteed by the 5th and 14th Amendments to the United States Constitution.

In Ground One, Petitioner contends that the joinder of the Arnquist and King carjacking counts with the Luna murder count resulted in an unfair trial.

In Ground Two, Petitioner contends that the joinder of Martin as a co-defendant at his trial resulted in an unfair trial.

In Ground Three, Petitioner asserts that there was insufficient evidence to prove that he was an aider and abettor in the murder of Luna.

In Ground Four, Petitioner asserts that the aggregate effect of the joinder of the charges and the joint trial with Martin, along with other trial errors, cumulatively prejudiced him.

D. STANDARD OF REVIEW

In order for federal subject matter jurisdiction over a petition for writ of habeas corpus to lie, the petition must allege that the petitioner is in custody in violation of the Constitution or laws or treaties of the United States. See 28 U.S.C.A. § 2254(a).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to habeas corpus petitions filed after 1996. The current petition was filed on May 29, 2009 and is therefore governed by the AEDPA. To obtain federal habeas relief, Petitioner must satisfy either § 2254(d)(1) or § 2254(d)(2). See Williams v. Taylor, 529 U.S. 362, 403 (2000). The Supreme Court interprets § 2254(d)(1)and (2) as follows:

09CV1185

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

<u>Williams</u>, 529 U.S. at 412-13.

A state court's decision may be found to be "contrary to" clearly established Supreme court precedent: (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from the [the court's] precedent." Id. at 405-406; <u>Lockyer v. Andrade</u>, 538 U.S. 63, 72-75 (2003). A state court decision involves an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or, "if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." <u>Williams</u>, 539 U.S. at 407; <u>Andrade</u>, 538 U.S. at 76.

When there is no reasoned decision from the state's highest

1    court, the Court "looks through" to the underlying appellate court

2    decision. <u>Ylst v. Nunnmeaker</u>, 501 U.S. 797, 801-06 (1991).  If the

3    dispositive state court order does not "furnish a basis for its

4    reasoning," federal habeas courts must conduct an independent review

5    of the record to determine whether the state court's decision is

6    contrary to, or an unreasonable application of, clearly established

7    Supreme Court law.  See <u>Delgado v. Lewis</u>, 223 F.3d 976, 982 (9th

8    Cir. 2000) (overruled in part by <u>Andrade</u>, 538 U.S. at 74-77).

9    <u>E. GROUND ONE: JOINDER OF COUNTS</u>

10        Petitioner claims that the trial court violated his 5th and

11   14th Amendment rights to due process when it denied his motion to

12   sever the carjacking charges from the murder charge. (Pet. at 6,

13   Memo of Points & Authorities at 13-17).  Respondent asserts that

14   joinder of the charges did not result in an unfair trial.

15        <u>1. Background</u>

16        The prosecution charged Petitioner and Martin with the

17   Arnquist carjacking, and the King attempted carjacking and attempted

18   murder. (Respondent Lodgment No. 1 at 14-19). In a separate case,

19   the prosecution charged Petitioner and Martin with the murder of

20   Luna. (Respondent's Lodgment No. 1 at 403-408). Thereafter, the

21   prosecution filed a Motion to Consolidate the two cases. (Respon-

22   dent's Lodgment No. 1 at 35-43). Petitioner filed an Opposition to

23   the Motion. (Respondent's Lodgment No. 1 at 64-69). Martin also

24   filed an Opposition to the Motion. (Respondent's Lodgment No. 1 at

25   46-60).  The court granted the Motion to Consolidate the charges.

26   (Respondent's Lodgment No. 1 at 6-14).

27   \\

28   \\

16                                                      09CV1185

1  2. <u>Consolidation of the Carjacking and Murder Charges Did Not</u>
   <u>Violate Petitioner's Constitutional Rights</u>

2

3          The California Court of Appeal's opinion in Petitioner's

4  direct appeal is the last reasoned state court determination of the

5  merits of Petitioner's claim.   Notwithstanding the fact that

6  Petitioner conceded that the charges were eligible for joinder, the

7  California Court of Appeal found consolidation of the charges was

8  appropriate because, notwithstanding the fact that Petitioner

9  conceded that the charges were eligible for joinder: (1) carjacking,

10 attempted murder and murder were in the same class of crimes, as

11 each is an assaultive crime against a person; (2) all of the charges

12 arose out of Petitioner's and Martin's desire to steal cars by using

13 deadly force, that the carjackings; and (3) attempted murder and

14 murder showed Petitioner's and Martin's common scheme or plan to

15 accomplish their goals, which is relevant to their intent, and that

16 they acted in accordance with their common scheme or plan.   Further,

17 the court noted that the crimes were sufficiently similar in that

18 they were all violent, serious and equally repugnant.    In the

19 Arnquist carjacking, Petitioner tried to put Taylor in the trunk of

20 the car when he was interrupted by Villegas.   Had Villegas not

21 interrupted the carjacking, Taylor's fate could have been as bad as

22 Luna's fate.   In the attempted carjacking of King, Petitioner and

23 Martin fired gunshots at King at close range.   Had it not been for

24 King's quick reaction in leaving the scene, he too could have been

25 murdered.   Consequently, Luna's murder was not likely to inflame the

26 jury any more than any of the other charges.   Moreover, the Court of

27 Appeal found that all of the charges against Petitioner and Martin

28 were strong, so there was not a "spill-over" effect of joining a

weak charge with a strong charge, which could have ultimately altered the outcome of some or all of the charges. Moreover, the jury's inability to reach a verdict on the charge of attempted murder of King demonstrates the jury's capacity to compartmentalize and consider each count independently. (Respondent's Lodgment No. 3 at 27-32).

Improper joinder does not, in itself, violate the U.S. Constitution.  Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Firth Amendment right to a fair trial. U.S. v. Lane 414 U.S. 438, 446, n. 8 (1986). This prejudice is shown if the impermissible joinder had a substantial and injurious effect or influence in determining the jury's verdict. Sandoval v. Calderon 241 F.3d 765, 772 (9th Cir. 2000). Courts have recognized that the risk of prejudice is great whenever joinder of charges allows evidence of other crimes to be introduced in a trial where the evidence would otherwise be inadmissible. See U.S. v. Lewis 787 F.2d 1318, 1322 (9th Cir. 1986).  Prejudice may also arise from the joinder of a strong evidentiary case with a weaker one. There is danger in both situations because it is difficult for a jury to compartmentalize the damaging information.  See Bean v. Calderon 163 F.3d 1073, 1084-1085 (9th Cir. 1998).

"The propriety of a consolidation rests with the sound discretion of the state trial judge.  The simultaneous trial of more than one offense must actually render (a) petitioner's state trial fundamentally unfair and hence violative of due process before relief pursuant to 28 U.S.C. §2254 would be appropriate." Featherstone v. Estelle 948 F.2d 1497, 1503 (9th Cir. 1989), citing

1   <u>Tribbitt v. Wainwright</u> 540 F.2d 840, 841 (5th Cir. 1976), <u>cert.</u>

2   <u>denied</u> 430 U.S. 910 (1977). "In considering whether a violation of

3   due process has occurred, the emphasis must be on the word 'actu-

4   ally;' for, viewed clearly, it is only the consequences of joinder,

5   over which the trial judge has much control, and not the joinder

6   itself, which may render the trial 'fundamentally unfair.'" <u>Herrring</u>

7   <u>v. Meachum</u> 11 F.3d 374, 377 (2nd Cir. 1993). Therefore, if a

8   petitioner claims a due process violation based on joinder of

9   offenses, he must prove that *actual* prejudice resulted from the

10  joinder. <u>Tribbitt</u> 540 F.2d at 841., see <u>Opper v. U.S.</u> 348 U.S. 84,

11  94-95 (1954).

12          Here, the Court does not find any prejudice, much less *actual*

13  prejudice in the joinder of the carjacking, attempted murder and

14  murder charges. Moreover, the Court does not find that the joinder

15  of the charges had a substantial or injurious effect or influence on

16  the jury's verdict.   The crimes with which Petitioner and Martin

17  were charged were all violent crimes against a person while using

18  guns.  The evidence of the carjackings, attempted murder and murder

19  were all indicative of Petitioner's and Martin's scheme or plan to

20  steal cars from their drivers, with the use of guns to accomplish

21  the thefts.   In furtherance of Petitioner's and Martin's scheme or

22  plan, Petitioner provided Martin with the gun which was used to

23  murder Luna, at which time Petitioner acknowledged, by saying to

24  Martin, "Here, you do it," meaning that Martin would shoot Luna.

25  Petitioner, together with Martin, chased Luna after Martin began

26  shooting at Luna; Petitioner helped Martin drag Luna's body to where

27  it was found and put carpet over Luna's body in an effort to conceal

28  it; and Petitioner drove Luna's vehicle away from the murder scene

1   to one location, and on the next day, drove Luna's vehicle to

2   another location where he helped Martin strip it.

3          Further, the Court is not convinced that Petitioner's

4   conviction for the murder of Luna was affected by a "spill-over" of

5   the evidence presented for the carjacking and attempted carjacking

6   convictions.  In fact, the opposite appears to be true.  Significant

7   evidence would have been cross-admissible if the carjacking charges

8   were separated from the murder charge.  Evidence of the attempted

9   carjacking and attempted murder of King would have been admissible

10  to show that Petitioner and Martin committed carjackings and that

11  Luna's murder was part of their common scheme or plan to steal cars

12  from their drivers by using deadly force.  Moreover, the evidence

13  was relevant to show Petitioner's and Martin's intent and that

14  Petitioner and Martin acted in accordance with their common scheme

15  or plan. Therefore, Petitioner's attempt to separate the carjackings

16  charges from the murder charge, is unsupported.

17         The record in this case reflects that both the carjackings

18  and the murder arose out of Petitioner's and Martin's common scheme

19  or plan to steal vehicles by using gun violence to intimidate or

20  kill the drivers of the vehicles.  One such act in furtherance of

21  that common scheme or plan resulted in the murder of one of the

22  drivers of a vehicle that they targeted for theft.  Another act in

23  furtherance of their common scheme or plan resulted in a failed

24  attempt to kill the driver of a vehicle targeted for theft.  In

25  order to give the jury the complete picture of what transpired at

26  each of the carjackings and the murder, significant evidence of each

27  offense was relevant and cross-admissible had the cases been tried

28  separately.  As a result, the is no indication that the consolida-

1  tion of the carjacking and murder charges resulted in any prejudice

2  to Petitioner, or that joinder of the charges had a substantial and

3  injurious effect or influence on the jury's verdict.   Therefore,

4  the Court cannot conclude that Petitioner's trial was fundamentally

5  unfair. Consequently, the Court RECOMMENDS that Petitioner's claim

6  in this regard be DENIED.

7  F. GROUND TWO: JOINDER OF DEFENDANTS

8        Petitioner claims that his rights to due process under the

9  Fifth and Fourteenth Amendments were violated when the trial court

10 denied his motion to sever his trial from the trial of his co-

11 defendant Martin.   Specifically, Petitioner contends that the joint

12 trial was fundamentally unfair because Martin presented a defense

13 that was entirely antagonistic to his defense in that Martin accused

14 and blamed Petitioner for the alleged crimes. (Petition at 7, Points

15 and Authorities at 18-20). Respondent argues that the denial of the

16 motion to sever Petitioner's trial from Martin's trial did not

17 result in an unfair trial.

18        1. Background

19        Prior to trial, Petitioner moved to sever his trial from the

20 trial of his co-defendant Martin.   A hearing was held, and the

21 motion was denied. (Respondent's Lodgment No. 9 at 20-26)

22        2. Denial of Petitioner's Motion To Sever His Trial From His
         Co-Defendant's Trial Did Not Violate Petitioner's
23       Constitutional Rights

24        The California Court of Appeal's opinion in Petitioner's

25 direct appeal is the last reasoned state court determination of the

26 merits of Petitioner's claim.   The Court of Appeal found that denial

27 of Petitioner's motion for severance was appropriate.   The Court of

28 Appeal considered the holdings in People v. Aranda 63 Cal. 2d 518

1   (1965), <u>Bruton v. U.S.</u> 391 U.S. 123 (1968) and <u>Zafiro v. U.S.</u> 506

2   U.S. 534 (1992)[2/] in finding the denial of the motion to sever to be

3   sound.  Further, the court acknowledged that the prosecutor agreed

4   not to present at trial Martin's statements that were violative of

5   the holdings of <u>Aranda</u> and <u>Bruton</u>.  Rather, the prosecutor said he

6   would present, and did present, only some of Martin's post-arrest

7   admissions that specifically implicated Martin, and no one else.

8   Further, the prosecutor said he would not present, and did not

9   present, Martin's pre-arrest evasive statements, arguably adoptive

10  admissions, that implicated Petitioner. Petitioner acknowledged that

11  severance was unnecessary in light of the prosecutor's representa-

12  tion to abide by the holdings of <u>Aranda</u> and <u>Bruton</u>.  The Court of

13  Appeal concluded that under the circumstances presented, the trial

14  court properly denied Petitioner's motion for severance.

15      In <u>Zafiro v. U.S.</u> 506 U.S. 534 (1992), and <u>Lane</u>, <u>supra</u>, the

16  U.S. Supreme Court addressed the question of misjoinder in the

17  context of Federal Rules of Criminal Procedure ("Fed. R. Crim. P."),

18  Rule 8.  In <u>Zafiro</u> and <u>Lane</u>, the Court applied federal constitu-

19  tional principles in its discussion of misjoinder and severance

20  under Rule 8.  In <u>Lane</u>, the Supreme Court noted that "the specific

21  joinder standards of Rule 8 are not themselves of constitutional

22  _____

23      [2/]     In <u>People v. Aranda</u>, The California Supreme Court held that the
            admission at trial of a non-testifying co-defendant's out-of-court
            confession, which inculpates the defendant, is not rendered harmless

24          by a jury instruction that the evidence should not be considered
            against the defendant.   Further, if the defendants are tried

25          together, the statement must be redacted to remove direct and
            indirect identification of the defendant, or it must be excluded

26          altogether.

            In <u>Bruton v. U.S.</u>, the U.S. Supreme Court held that introduction at

27          trial of an incriminating extrajudicial statement by a non-
            testifying co-defendant violates the defendant's Sixth Amendment

28          right to cross-examination, even though the jury is instructed to
            disregard the statement in determining the defendant's guilt or
            innocence.

09CV1185

1    magnitude." <u>Lane</u>, 414 U.S. at 446, n. 8.  However, the Court also

2    stated that "misjoinder would give rise to the level of a constitu-

3    tional violation only if it results in prejudice so great as to deny

4    a defendant his Fifth Amendment right to a fair trial." <u>Id.</u> Further,

5    in <u>Zafiro</u>, the Court explained the relationship between the Federal

6    Rules of Criminal Procedure and general fair trial principles:

> (I)t is well settled that defendants are not entitled
> to severance merely because they may have a better
> chance of acquittal in separate trials.  Rules 8(b)and
> 14 are designed 'to promote economy and efficiency and
> to avoid a multiplicity of trials, (so long as) these
> objectives can be achieved without substantial preju-
> dice to the right of the defendants to a fair trial.'

11   <u>Zafiro</u>, 506 U.S. at 540, citing <u>Bruton</u>, <u>supra</u>. (other citations

12   omitted.)

13        Fed. R. Crim P. 8(b) states in pertinent part:

> The indictment or information may charge 2 or more
> defendants if they are alleged to have participated in
> the same act... or in the same series of acts...,
> constituting an offense or offenses...

17        There is a preference in the federal system for joint trials

18   of defendants who are indicted together.  Joint trials promote

19   efficiency and serve the interests of justice by avoiding inconsis-

20   tent verdicts. <u>Zafiro</u> 506 U.S. at 537.

21        However, in interpreting Fed. R. Crim P. 14[3/], federal courts

22   have recognized that "mutually antagonistic" or "irreconcilable"

23   defenses may be so prejudicial in some circumstances to mandate

24   severance.  Nevertheless, courts have reversed relatively few

25   convictions for failure to grant severance on grounds of mutually

---

27        [3/]   Fed R. Crim P. 14(a) states in pertinent part:
28              If the joinder of... defendants in an indictment, an information, or
                a consolidation for trial appears to prejudice a defendant... the
                court may order separate trials of counts, sever the defendants'
                trials or provide other relief that justice requires.

1    antagonistic or irreconcilable defenses. Id. at 538.

2        The Zafiro court held that "when defendants are properly

3    joined under Rule 8(b) district court should grant a severance under

4    Rule 14 only if there is a serious risk that a joint trial would

5    compromise a specific trial right of one of the defendants, or

6    prevent the jury from making a reliable judgment about guilt or

7    innocence." Id. at 539.

8        Here the California Court of Appeal identified and correctly

9    applied the applicable United States Supreme Court law.  In so

10    doing, it reversed Petitioner's conviction for the Arnquist

11    carjacking because the only evidence linking Petitioner to that

12    carjacking was Martin's statement to Kellas and DeBenedetti that

13    Petitioner assisted him in committing the carjacking, and that

14    Petitioner concurred in Martin's statement.  On the other hand, the

15    evidence against Martin was overwhelming.  Martin confessed to the

16    Arnquist carjacking after he heard Kellas' tape recording of him

17    boasting about it.  Additionally, the eye witness identification

18    evidence of Petitioner was very weak in that Arnquist and Taylor

19    could not identify Petitioner as one of the men involved in the

20    carjacking.  As a result, the Court of Appeal concluded that had

21    Martin's statement not been introduced at trial, there was little,

22    if any, evidence with which the jury could have found Petitioner

23    guilty of the carjacking.[4/]

24

25       [4/] The Court of Appeal does not address what impact, if any, the jury's decision to convict on this count, where the evidence was constitutionally

26    insufficient, spilled over and poisoned the jury's ability to objectively and independently consider the evidence regarding the other counts.  However, as

27    noted earlier, the jury was unable to reach a verdict on the attempted murder (of King) charge which reflects its diligent effort to compartmentalize the evidence.

28    As the Court of Appeal noted, the evidence was overwhelming against Petitioner on the remaining counts.  Accordingly, this Court concludes that Petitioner was not prejudiced by the joinder of the Arnquist carjacking.

1    Nevertheless, the Court of Appeal, applying the same United

2   States Supreme Court precedent, found Petitioner's convictions for

3   the attempted carjacking of King and the murder of Luna to be

4   justified and correct under constitutional standards.

5    In the King attempted carjacking, the independent evidence

6   against Petitioner was strong.  King positively identified Peti-

7   tioner in a photographic line-up, at the preliminary hearing and at

8   trial, as the man who tried to carjack his car. King testified that

9   he did not know Petitioner.  Further, a piece of paper with King's

10  name and phone number on it was found in Petitioner's car and

11  Petitioner gave incredible explanations for having that piece of

12  paper in his car.  Moreover, Petitioner's conviction was not reliant

13  upon anything that Martin allegedly said.

14    In the Luna murder, the evidence supporting Petitioner's

15  conviction as an aider and abettor in the murder was very strong.

16  DiFrancesco testified that Petitioner gave Martin the murder weapon

17  and told Martin,"Here, you do it." DiFrancesco testified that after

18  Martin began shooting at and chasing Luna, Petitioner joined in the

19  chase.  DiFrancesco further testified that after Luna was killed,

20  Petitioner helped Martin drag Luna's body to where it was concealed.

21  Additionally, Petitioner drove Luna's Lexus away from the murder

22  scene.  Moreover, the trial court instructed the jury with CALJIC

23  No. 17.00, which directs the jury to separately consider each

24  defendant. (Respondent's Lodgment No. 1 at 243)

25    This Court agrees with the Court of Appeal.  The Court of

26  Appeal correctly identified and applied the controlling United

27  States Supreme Court precedent in overturning one of Petitioner's

28  convictions for carjacking, but affirming the other convictions for

1   attempted carjacking and murder.

2        In the King attempted carjacking and the Luna murder, there
3   was strong independent evidence that Petitioner committed both
4   crimes.   Any statements made by Martin were not used as the
5   evidence with which the jury found Petitioner guilty.   Instead,
6   Petitioner's own words and actions supplied the evidence with which
7   to convict him of the King attempted carjacking and the Luna murder.
8   Therefore, the Court concludes that even if Petitioner and Martin
9   had mutually antagonistic defenses, Petitioner was not prejudiced by
10  being tried with Martin in a joint trial.   Moreover, any prejudice
11  that Petitioner may have suffered as a result of the Arnquist
12  carjacking conviction was remedied by the California Court of
13  Appeal. As a result, Petitioner is not entitled to relief on this
14  claim.   The Court RECOMMENDS that Petitioner's claim in this regard
15  be DENIED.

16  G. GROUND THREE: SUFFICIENCY OF EVIDENCE

17       Petitioner claims that there was insufficient evidence to
18  support his conviction for the murder of Luna on an aider and
19  abettor theory.   Respondent argues that there was sufficient
20  evidence to support Petitioner's conviction for the murder of Luna.

21       The clearly established federal law regarding sufficiency of
22  the evidence claims is set forth by the United States Supreme Court
23  in Jackson v. Virginia, 443 U.S. 307, 319 (1979).   See Mitchell v.
24  Prunty, 107 F.3d 1337, 1340 n.3 (9th Cir. 1997), overruled on other
25  grounds by Santamaria v. Horsley, 133 F.3d 1242, 1248 (9th Cir.
26  1998) (en banc).   In Jackson, the Court held that the Fourteenth
27  Amendment's Due Process Clause is violated, and an applicant is
28  entitled to habeas corpus relief, "if it is found that upon the

1    record evidence adduced at the trial no rational trier of fact could

2    have found proof of guilt beyond a reasonable doubt." _Jackson_, 443

3    U.S. at 324.   In making this determination, habeas courts "must

4    respect the province of the jury to determine the credibility of

5    witnesses, resolve evidentiary conflicts, and draw reasonable

6    inferences from proven facts by assuming that the jury resolved all

7    conflicts in a manner that supports the verdict." _Jackson_, 443 U.S.

8    at 319.   Once a state court fact finder has found a defendant

9    guilty, federal habeas courts must consider the evidence "in the

10   light most favorable to the prosecution." _Id._   Federal habeas

11   courts must also analyze _Jackson_ claims "with explicit reference to

12   the substantive elements of the criminal offense as defined by _state_

13   _law._" _Id._ at 324 n.16 (emphasis added).

14        Two Ninth Circuit cases have addressed in dicta the post-

15   AEDPA standard of review for sufficiency-of-the evidence claims.   In

16   _Mitchell v. Prunty_, _supra_, the Ninth Circuit stated that in

17   reviewing the state court's determination that sufficient evidence

18   supports the guilty verdict, federal habeas courts should ask:  "Was

19   the state court's application of _Jackson_ to the facts of this case

20   reasonable?" _Mitchell_ 107 F.3d 1337, 1340 n.3.   The _Mitchell_ court

21   also indicated that state court which reviewed the sufficiency of

22   the evidence claim must have taken "more than a perfunctory look at

23   the relationship between the evidence presented and the verdict."

24   _Id._   Moreover, in _Jones v. Wood_, 114 F.3d at 1002, 1013 (9th Cir.

25   1997), the Ninth Circuit stated:

26              [T]he district court's duty to ascertain
              the sufficiency of the evidence by engaging
27           in a thorough review of the complete state
              court record is unaffected by the AEDPA.
28           Without such a review of the record, it is
              impossible to determine whether the state

1
       court adjudication rested on an "unreason-
       able application" of clearly established

2
       federal law or an "unreasonable determina-
       tion" of fact.

3

4       Thus, this Court has engaged in a thorough review of the

5  complete state court record to determine whether the state court

6  unreasonably applied <u>Jackson</u> and whether the state court made

7  unreasonable determinations of fact.   <u>Id.</u>

8       Here, the California Court of Appeal applied the correct rule

9  of law regarding sufficiency of the evidence.[5/]

10       Under California law, there are two types of aider and

11  abettor liability.  An aider and abettor is liable for the intended

12  offense, but also "for any other offense that was a 'natural and

13  probable consequence' of the crime aided and abetted.  <u>People v.</u>

14  <u>Prettyman</u>, 14 Cal. 4th 248, 260 (1996).  Whether a crime is the

15  natural and probable consequence of the intended crime is a factual

16  issue to be determined by the jury under an objective standard.  The

17  jury must be satisfied that the second crime was reasonably

18  forseeable under the circumstances of the case. <u>People v. Nguyen</u>, 21

19  Cal. App. 4th 518, 531 (1993).

20

---

21      [5/]   The Court of Appeal identified and applied <u>People v. Young</u>, 34 Cal.
22  4th 1149 (2005) and <u>People v. Johnson</u>,26 Cal. 3d 557 (1980).

23      In <u>Young</u>, the California Supreme Court stated, "In reviewing the
sufficiency of the evidence... the question we ask is 'whether,
after viewing the evidence in the light most favorable to the

24  prosecution, *any* rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt.'" <u>Young</u>
25  34 Cal. 4th at 1175. (emphasis in the original)

26      In <u>Johnson</u>, the California Supreme Court stated, "(We) 'must view
the evidence in a light most favorable to (the prosecution) and
presume in support of the judgment the existence of every fact that
27  the trier could reasonably deduce from the evidence.'" <u>Johnson</u> 26
Cal. 3d at 576.

28
      The Court notes that <u>Young</u> and <u>Johnson</u> state substantially the same
standard as that enunciated in <u>Jackson v. Virginia</u>.

09CV1185

1       The Court of Appeal, in applying these principles, found
2   Petitioner's conviction for the murder of Luna, as an aider and
3   abettor, to be amply supported by the evidence presented at trial.
4   Specifically, the Court of Appeal found that Petitioner aided and
5   abetted Martin in the commission of a planned armed robbery of
6   Luna's Lexus.  This armed robbery could have, and did, naturally and
7   probably lead to the shooting and killing of Luna.  In anticipation
8   of the armed robbery, Petitioner supplied Martin with a gun and told
9   Martin, "Here, you do it." Martin used the gun to shoot and kill
10  Luna so that he and Petitioner could steal Luna's Lexus.    In
11  furtherance of Petitioner's and Martin's plan to commit an armed
12  robbery of Luna's Lexus, Petitioner chased Luna after Martin began
13  shooting.   Luna was killed.   Further, after Luna was killed,
14  Petitioner assisted Martin in dragging and concealing Luna's body.
15  The jury could have reasonably inferred that Petitioner gave Martin
16  the gun with the intent of facilitating the armed robbery of Luna's
17  Lexus, and if Luna was killed during the armed robbery, Petitioner
18  would assist Martin in concealing or disposing of Luna's body.

19      Additionally, the Court of Appeal found that a reasonable
20  person in Petitioner's position should have known that murder was a
21  reasonably forseeable consequence of his and Martin's plan to commit
22  an armed robbery in order to steal Luna's Lexus.

23      This Court agrees with the Court of Appeal.  The evidence
24  presented at trial, as detailed by the Court of Appeal, would allow
25  a rational trier of fact to find Petitioner's guilt as an aider and
26  abettor beyond a reasonable doubt.  The evidence clearly shows that
27  Petitioner and Martin intended to commit an armed robbery of Luna in
28  order to steal Luna's Lexus.  A natural and probable consequence of

1   committing an armed robbery is that the victim would be shot and

2   killed.   The killing of Luna, in furtherance of the armed robbery,

3   was reasonably forseeable, under the circumstances.   Further, the

4   jury was correctly instructed on the California law of aider and

5   abettor liability. (Respondent's Lodgment No. 3 at 47).

6        Therefore, this Court finds that pursuant to <u>Jackson v.</u>

7   <u>Virginia</u>, a rational trier of fact could have found, and did find,

8   that the evidence presented at trial supplied proof beyond a

9   reasonable doubt that Petitioner was guilty of Luna's murder as an

10  aider and abettor.

11       As a result, the Court RECOMMENDS that Petitioner's claim in

12  this regard be DENIED.

13  <u>H. GROUND FOUR: CUMULATIVE PREJUDICE</u>

14       Petitioner claims that the aggregate effect of joining the

15  charges, joining the defendants, along with other trial errors,[6]

16  cumulatively prejudiced him.   Respondent argues that there is no

17  controlling United States Supreme Court precedent concerning this

18  area of the law, and where there is no controlling precedent, there

19  is no basis for habeas corpus relief under 28 U.S.C. §2254.

20       With regard to this claim, the California Court of Appeal

21  found that there were no errors at trial to cumulate.   Therefore,

22  Petitioner's claim failed. (Respondent's Lodgment No. 3 at 48-49).

23       "The Supreme Court has clearly established that the combined

24  effect of multiple trial court errors violates due process where it

25  renders the resulting trial fundamentally unfair." <u>Parle v.</u>

26  <u>Runnels</u>, 505 F.3d 922, 927 (9th Cir. 2007), citing <u>Chambers v.</u>

27

28

---

[6]   Petitioner does not state what alleged "other trial errors" there may have been.

1    <u>Mississippi</u>, 410 U.S. 284, 298 (1973).  Where no single trial error

2    in isolation is sufficiently prejudicial to warrant habeas relief,

3    "the cumulative effect of multiple errors may still prejudice a

4    defendant."  <u>United States v. Frederick</u>, 78 F.3d 1370, 1381 (9th

5    Cir. 1996).  Where "there are a number of errors at trial, 'a

6    balkanized, issue-by-issue harmless error review' is far less

7    effective than analyzing the overall effect of all the errors in the

8    context of the evidence introduced at trial against the defendant."

9    <u>Id.</u>, quoting <u>United States v. Wallace</u>, 848 F.2d 1464, 1476 (9th Cir.

10   1988).  "Where the government's case is weak, a defendant is more

11   likely to be prejudiced by the effect of cumulative errors."

12   <u>Frederick</u>, 78 F.3d at 1381.

13        Here, there is no basis for finding a due process violation

14   arising from the cumulative effect of any trial errors.  As set

15   forth above, Petitioner's three alleged errors are without merit,

16   and with respect to any of Petitioner's other claims, he has not

17   identified any errors to cumulate.  Since Petitioner has not

18   established errors which could cumulate to violate due process, the

19   California Court of Appeal's adjudication of this claim was neither

20   contrary to, nor involved an unreasonable application of, clearly

21   established federal law, and was not based on an unreasonable

22   determination of the facts in light of the evidence presented in the

23   state court proceedings.  Therefore, Petitioner's claim fails.  As

24   a result, the Court RECOMMENDS that Petitioner's claim in this

25   regard be DENIED.

26                    **<u>CONCLUSION AND RECOMMENDATION</u>**

27        After a review of the record in this matter, the undersigned

28   Magistrate Judge recommends that the Petition for Writ of Habeas

1   Corpus be **DENIED** with prejudice.

2          This report and recommendation of the undersigned Magistrate

3   Judge is submitted to the United States District Judge assigned to

4   this case, pursuant to the provision of 28 U.S.C. § 636(b)(1).

5          **IT IS ORDERED** that no later than <u>January 29, 2010</u>, any party

6   to this action may file written objections with the Court and serve

7   a copy on all parties.  The document should be captioned "Objections

8   to Report and Recommendation."

9          **IT IS FURTHER ORDERED** that any reply to the objections shall

10  be filed with the Court and served on all parties no later than

11  <u>February 12, 2010</u>. The parties are advised that failure to file

12  objections within the specified time may waive the right to raise

13  those objections on appeal of the Court's order.  <u>Martinez v. Ylst</u>,

14  951 F.2d 1153 (9th Cir. 1991).

15

16  DATED:  December 30, 2009

17

18                                  _____

19                                  Hon. William V. Gallo
                                    U.S. Magistrate Judge

20

21

22

23

24

25

26

27

28

09CV1185